328 F.3d 1136
 Richard WARREN; Triplet Music Enterprises, Inc., a Corporation existing under the laws of California; Mini-Persons, Inc., a California Corporation & Successor-in-Interest of Triplet; Forerunner Industries, Inc., a Delaware Corporation authorized to do business in California, Plaintiffs-Appellants,
v.
FOX FAMILY WORLDWIDE, INC.; The Christian Broadcasting Network, Inc.; Princess Cruise Lines, Ltd., Defendants-Appellees.
 No. 01-57107.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 13, 2003.
 Filed May 13, 2003.
 
 COPYRIGHT MATERIAL OMITTED Leonard J. Comden (argued) and Alan I. Cyrlin, Wasserman, Comden, Casselman & Pearson, Tarzana, CA, for the plaintiffs-appellants.
 Robert C. Welsh (argued) and Drew E. Breuder, O'Melveny & Myers, Los Angeles, CA, for defendants-appellees Fox Family Worldwide, Inc., The Christian Broadcasting Network, Inc., and MTM Productions.
 Jeffrey C. Briggs, Alschuler Grossman Stein & Kahan, Santa Monica, CA, for defendant-appellee Princess Cruise Lines, Ltd.
 Appeal from the United States District Court for the Central District of California; Margaret M. Morrow, District Judge, Presiding. D.C. No. CV-01-04667-MMM.
 Before B. FLETCHER, ALARCÓN and HAWKINS, Circuit Judges.
 MICHAEL DALY HAWKINS, Circuit Judge.
 
 
 1
 In this dispute between plaintiff-appellant Richard Warren ("Warren") and defendants-appellees Fox Family Worldwide ("Fox"), MTM Productions ("MTM"),[1] Princess Cruise Lines ("Princess"), and the Christian Broadcasting Network ("CBN"), Warren claims that defendants infringed the copyrights in musical compositions he created for use in the television series "Remington Steele." Concluding that Warren has no standing to sue for infringement because he is neither the legal nor beneficial owner of the copyrights in question, we affirm the district court's Rule 12 dismissal of Warren's complaint.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 Warren and Triplet Music Enterprises, Inc. ("Triplet") entered into the first of a series of detailed written contracts with MTM concerning the composition of music for "Remington Steele." This agreement stated that Warren, as sole shareholder and employee of Triplet, would provide services by creating music in return for compensation from MTM. Under the agreement, MTM was to make a written accounting of all sales of broadcast rights to the series and was required to pay Warren a percentage of all sales of broadcast rights to the series made to third parties not affiliated with ASCAP or BMI.[2]
 
 
 3
 Warren brought suit in propria persona against Fox, MTM, CBN, and Princess, alleging copyright infringement, breach of contract, accounting, conversion, breach of fiduciary duty, breach of covenants of good faith and fair dealing, and fraud.
 
 
 4
 After retaining counsel, Warren filed a First Amended Complaint ("the amended complaint") alleging the same causes of action. Warren claims he created approximately 1,914 musical works used in the series pursuant to the agreements with MTM; that MTM and Fox have materially breached their obligations under the contracts by failing to account for or pay the full amount of royalties due Warren from sales to parties not affiliated with ASCAP or BMI; and that MTM and Fox infringed Warren's copyrights in the music by continuing to broadcast and license the series after materially breaching the contracts.
 
 
 5
 As to the other defendants, Warren claims that CBN and Princess infringed his copyrights by broadcasting "Remington Steele" without his authorization. While alleging that CBN and Princess were operating pursuant to a license or distribution from MTM, Warren claims that their behavior was nevertheless infringement because the broadcasts occurred after MTM breached its agreement with him, and so the copyright reverted to him and any license CBN or Princess may have had was no longer valid.[3] Warren seeks damages, an injunction, and an order declaring him the owner of the copyrights at issue.
 
 
 6
 Defendants moved to dismiss, arguing that Warren's infringement claims should be dismissed for lack of standing because he is neither the legal nor beneficial owner of the copyrights. The district court dismissed Warren's copyright claims without leave to amend and dismissed his state law claims without prejudice to their refiling in state court, holding that Warren lacked standing because the works were made for hire, and because a creator of works for hire cannot be a beneficial owner of a copyright in the work. Warren v. Fox Family Worldwide, Inc., 171 F.Supp.2d 1057, 1070-72(C.D.Cal.2001). Warren appeals.
 
 DISCUSSION
 
 7
 We review de novo a district court's order dismissing a complaint for lack of jurisdiction under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6). King County v. Rasmussen, 299 F.3d 1077, 1088 (9th Cir.2002). The nature of the dismissal requires us to accept all allegations of fact in the complaint as true and construe them in the light most favorable to the plaintiffs. Zimmerman v. City of Oakland, 255 F.3d 734, 737 (9th Cir.2001). However "we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96(9th Cir.1998), and "[w]e do not ... necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981). A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence. White v. Lee, 227 F.3d 1214, 1242 (9th Cir.2000). Where jurisdiction is intertwined with the merits, we must "assume[] the truth of the allegations in a complaint ... unless controverted by undisputed facts in the record." Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987).
 
 Standing
 
 8
 Under the Copyright Act of 1976 (the "Act"), "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). MTM argues that the works Warren composed were "works made for hire," and Warren is therefore not the legal owner and thus lacks standing. Warren argues that the contracts do not create a work-for-hire relationship, and that, even if they do, MTM's breaches of the agreements entitle Warren to rescind the contracts and regain legal ownership of the copyrights. In the alternative, he argues that he is a beneficial owner because he is entitled to royalties and therefore he may sue under § 501(b).
 
 
 9
 It is appropriate to address the question of standing in deciding a motion to dismiss because "[t]he elements of standing are `an indispensable part of the plaintiff's case,' and accordingly must be supported at each stage of litigation in the same manner as any other essential element of the case." Cent. Delta Water Agency v. United States, 306 F.3d 938, 947 (9th Cir.2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Further, if Warren lacks standing to assert his federal copyright claims, the district court did not have subject matter jurisdiction and dismissal was appropriate. See Fed.R.Civ.P. 12(b)(1); Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 664 (9th Cir.2002). However, at this stage of the pleading, Warren need only show that the facts alleged, if proved, would confer standing upon him. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
 
 A. Work-For-Hire Status
 
 10
 The Act provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). However, if the work is made for hire, "the employer or other person for whom the work was prepared is considered the author..., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights in the copyright." 17 U.S.C. § 201(b). Section 101 of the Act defines a "work made for hire" as:
 
 
 11
 (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use ... as a part of a motion picture or other audiovisual work, ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.
 
 
 12
 17 U.S.C. § 101. The parties agree that Warren was not an employee of MTM, but MTM contends that the agreements signed by the parties illustrate an express agreement that the works in question were specially commissioned as works for hire.[4] We agree.
 
 
 13
 The Act confers work-for-hire status on a work where "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The first agreement, signed on February 25, 1982, states that MTM contracted to employ Warren "to render services to [MTM] for the television pilot photoplay now entitled `Remington Steele.'" It also is clear that the parties agreed that MTM would "own all right, title and interest in and to [Warren's] services and the results and proceeds thereof, and all other rights granted to [MTM] in [the Music Employment Agreement] to the same extent as if ... [MTM were] the employer of [Warren]." The Music Employment Agreement provided:
 
 
 14
 As [Warren's] employer for hire, [MTM] shall own in perpetuity, throughout the universe, solely and exclusively, all rights of every kind and character, in the musical material and all other results and proceeds of the services rendered by [Warren] hereunder and [MTM] shall be deemed the author thereof for all purposes.
 
 
 15
 The parties later executed contracts almost identical to these first agreements in June 1984, July 1985, and November 1986. As the district court noted, these subsequent contracts are even more explicit in defining the compositions as "works for hire." Letters that Warren signed accompanying the later Music Employment Agreements provided: "It is understood and agreed that you are supplying [your] services to us as our employee for hire ... [and] [w]e shall own all right, title and interest in and to [your] services and the results and proceeds thereof, as works made for hire." The Music Employment Agreements executed in conjunction with these letters further provided that:
 
 
 16
 [MTM] shall own in perpetuity, ... solely and exclusively, ... all rights of every kind and character, in the musical material and all other results and proceeds of the service rendered by [Warren] hereunder and [MTM] shall be deemed the author thereof for all purposes, to the same extent as if [MTM] were [Warren]'s employer for hire.[5]
 
 
 17
 That the agreements did not use the talismanic words "specially ordered or commissioned" matters not, for there is no requirement, either in the Act or the caselaw, that work-for-hire contracts include any specific wording. In fact, in Playboy Enterprises v. Dumas, 53 F.3d 549 (2d Cir.1995), the Second Circuit held that legends stamped on checks were writings sufficient to evidence a work-for-hire relationship where the legend read: "By endorsement, payee: acknowledges payment in full for services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check, and confirms ownership by Playboy Enterprises, Inc. of all right, title and interest (except physical possession), including all rights of copyright, in and to the Work." Id. at 560. The agreements at issue in the instant case are more explicit than the brief statement that was before the Second Circuit.
 
 
 18
 By the same token, that the contracts were entitled "Music Employment Agreement" and not "Work-For-Hire Agreement" is not conclusive, as nothing in the Act or our caselaw indicates that an agreement's title is a dispositive factor in determining whether a work-for-hire relationship exists. In this case, not only did the contracts internally designate the compositions as "works made for hire," they provided that MTM "shall be deemed the author thereof for all purposes." This is consistent with a work-for-hire relationship under the Act, which provides that "the employer or other person for whom the work was prepared is considered the author." 17 U.S.C. § 201(b).
 
 
 19
 That the works were created at the behest of MTM is conclusively demonstrated by the plain language of the contracts. The contracts specified that Warren was, among other things, to "compose an original musical score ... mak[ing] such revisions in the musical material as [MTM] may require," and clearly indicate that such composing was to be done for the sole purpose of the "Remington Steele" program. The contracts also provide that "[MTM]'s judgment shall be final in all matters, including matters involving artistic and creative matters," and that Warren's services would be rendered "in such manner as [MTM] may direct, under the instructions and control, in accordance with the ideas of and at the times and places required by the duly authorized representative of [MTM]."
 
 
 20
 Warren argues that the use of royalties as a form of compensation demonstrates that this was not a work-for-hire arrangement. While we have not addressed this specific question, the Second Circuit held in Playboy that "where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." 53 F.3d at 555. However, Playboy clearly held that this factor was not conclusive. In addition to noting that the presence of royalties only "generally" weighs against a work-for-hire relationship, Playboy cites Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972), for the proposition that "[t]he absence of a fixed salary ... is never conclusive." 53 F.3d at 555. Further, the payment of royalties was only one form of compensation given to Warren under the contracts. Warren was also given a fixed sum "payable upon completion." That some royalties were agreed upon in addition to this sum is not sufficient to overcome the great weight of the contractual evidence indicating a work-for-hire relationship.[6]
 
 
 21
 Warren further argues that it was not his intent to enter into a work-for-hire relationship when he signed the employment agreements. While California law permits consideration of parol evidence "to explain the meaning of the terms of a contract even when the meaning appears unambiguous," Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 826(9th Cir.2001), the evidence Warren seeks to admit does not explain the contract so much as attempt to contradict it. Warren's protestations thus do not undermine the explicit and unambiguous contract that establishes his compositions as "works made for hire." Because the works were made for hire, Warren retains no rights of authorship and lacks standing to sue for infringement as a legal owner of the copyrights. See 17 U.S.C. §§ 201(b), 501(b).
 
 B. Validity of the Agreements
 
 22
 Even if the contracts do evidence a work-for-hire relationship between himself and MTM, Warren argues that the contracts granting the copyrights to MTM should be rescinded because MTM failed to pay the full amount of the royalties to which he was entitled. Warren argues that this breach entitles him to reclaim the copyrights and sue for infringement, even if the music was originally created as a work for hire. He bases this conclusion primarily on a passage from the Nimmer treatise which states: "If ... the employer's claim of copyright is based upon the agreement ... of the employee, then surely a material breach by the employer must under traditional principles of contract law entitle the employee to rescind the employment agreement and hence claim back the copyright which he had agreed to convey." 2 M. & D. Nimmer, Nimmer on Copyright, § 5.03[E] (2000).
 
 
 23
 However, we held in Rano v. Sipa Press, Inc., 987 F.2d 580 (9th Cir.1993), that "[a] breach will justify rescission of a licensing agreement only when it is of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.... [T]he breach must constitute a total failure in the performance of the contract." Id. at 586 (internal quotations omitted). MTM's alleged failure to pay royalties does not constitute a total failure of performance. See also Royal v. Leading Edge Prod. Inc., 833 F.2d 1, 3-4 (1st Cir.1987) (noting the "dubious provenance" of Nimmer's theory and holding that "there is neither authority nor precedent for the proposition that a breach of the royalty agreement alone catalyzes an implicit exception to the work-made-for-hire doctrine") (emphasis in original).
 
 
 24
 Further, as the district court correctly points out, Nimmer's theory is based on an employer-employee relationship, in which the employer obtains ownership of a copyright as an implied term of the employment agreement. In such a case, the employee has no specific remedy for wrongful termination, and rescission may be appropriate. However, when an express agreement "makes clear that the trade-off for the proprietary copyright interest is not a job, but the payment of royalties," and an "unambiguous compact occupies the field," rescission is not necessary because the contract makes explicit what consequences will flow from a breach. Royal, 833 F.2d at 3. Significantly, the agreements between Warren and MTM provided that money damages would remedy any breach, and that rescission was not available.[7]
 
 C. Beneficial Ownership
 
 25
 Finally, Warren claims that, even if the agreements remain valid and the compositions are works made for hire, he has standing to bring an infringement suit because the contractual grant of royalties makes him a beneficial owner of the copyright. The Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright" is entitled to sue for infringement, 17 U.S.C. § 501(b), and the legislative history accompanying the Act states that "[a] `beneficial owner' for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." H.R. Rep. No. 1476, at 159, reprinted in 1976 U.S.C.C.A.N. 5659, 5775; see also Cortner v. Israel, 732 F.2d 267, 271(2d Cir.1984) (quoting same).
 
 
 26
 Whether a creator of a work for hire may be a beneficial owner when he receives royalties as compensation is a question of first impression in this circuit. Several other circuits have held that a creator may be a beneficial owner where a creator assigned all rights to a work, but the assignee was obligated to pay royalties to the composer if it exploited the work. See Batiste v. Island Records, Inc., 179 F.3d 217, 220 n. 2 (5th Cir.1999); Cortner, 732 F.2d at 270. In Cortner, the Second Circuit held that
 
 
 27
 [w]hen a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright.... Otherwise the beneficial owner's interest in the copyright could be diluted or lessened by a wrongdoer's infringement.
 
 
 28
 732 F.2d at 271. Importantly, however, these cases did not address the payment of royalties in the context of a work-for-hire relationship, which involves not an assignment of rights, but an original vesting of all rights of authorship in the employer or "person for whom the work was prepared." See 17 U.S.C. § 201.
 
 
 29
 Only the Seventh Circuit has addressed this specific issue, finding that, absent an express grant of rights, a creator of a work for hire cannot be a beneficial owner. In Moran v. London Records, Ltd., 827 F.2d 180 (7th Cir.1987), the court relied on legislative history to hold that a composer in a work-for-hire relationship lacked standing to sue, even where he had the right under his employment contract to receive royalties for the use his employer made of his performance. The Moran court held that, in enacting § 501(b)'s standing provision in the Act, Congress did not intend to "expand the concept of beneficial ownership beyond that found in the prior case law," which contained no cases applying beneficial ownership to a work-for-hire arrangement. Id. at 183. The court held that the legislative history indicating beneficial ownership where an assignment is made in exchange for royalties has no bearing on the work-for hire situation where no "assignment" takes place. Id. Therefore, that the legislative history to the Act mentioned only the "assignment" example "supports the conclusion that Congress did not intend to extend the concept of beneficial ownership to include an employee in a work-made-for-hire arrangement." Id.
 
 
 30
 We conclude that the statutory language of the Act supports the Seventh Circuit's analysis. The Act provides that copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). And, in the case of a work made for hire, the person for whom the work was prepared is considered the author, and "unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright." Id. § 201(b) (emphasis added).
 
 
 31
 The Act thus envisions that the parties to a work-for-hire agreement will explicitly contract to allow the creator a beneficial interest in the work, if they so desire. We therefore hold that because the Act does not envision a work-for-hire arrangement as an "assignment," but rather provides for initial vesting of all rights of authorship in the person for whom the work was prepared, a grant of royalties to a creator of a work for hire, absent an express contractual provision to the contrary, does not create a beneficial ownership interest in that creator. Therefore, Warren is not a legal or beneficial owner of the copyrights, and lacks standing to sue under the Act.
 
 CONCLUSION
 
 32
 The agreements between Warren and MTM conclusively show that the musical compositions created by Warren were created as works for hire, and Warren is therefore not the legal owner of the copyrights therein. Further, because rescission is not an available remedy, Warren cannot regain legal ownership of the copyrights even if MTM breached the agreements. Nor does Warren have standing to sue for infringement as a beneficial owner. The mere assignment of royalties does not create a beneficial interest in the copyright in a work for hire.
 
 
 33
 All pending requests or motions are denied as moot.
 
 
 34
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 MTM is now a subsidiary of Fox
 
 
 [2]
 These agreements were renewed and re-executed with slight modifications in 1984, 1985 and 1986
 
 
 [3]
 Warren also claims that, even if the agreements were still valid, CBN was not affiliated with ASCAP or BMI and Warren has not received the royalties from these broadcasts to which he was entitled under the contracts
 
 
 [4]
 Because the parties are not in an employer-employee relationship, the Copyright Act requires not only that the work be specially commissioned pursuant to a written agreement, but that the work come within one of the enumerated categories listed in 17 U.S.C. § 101(2)See Dumas v. Gommerman, 865 F.2d 1093, 1104 (9th Cir.1989). There is no doubt that the works fall into one of these categories because it is undisputed that they are part of an audiovisual work. See 17 U.S.C. § 101(2).
 
 
 [5]
 Warren argues that it is improper to rely on the agreements because they are extrinsic to the complaint. However, in ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidenceSee White, 227 F.3d at 1242. In addition, while a court must generally refrain from considering extrinsic evidence in deciding a 12(b)(6) motion, it may consider documents on which the complaint "necessarily relies" and whose "authenticity ... is not contested." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir.2001).
 Consideration of the extrinsic evidence is necessary to decide whether Warren is a legal or beneficial owner of the copyrights, and whether he accordingly has standing to sue for infringement. As discussed supra, where the jurisdictional question of standing is intertwined with the merits of the case, consideration of extrinsic material does not contravene the principle that the truth of the allegations in a complaint must be assumed. Roberts, 812 F.2d at 1177. While a court must accept all factual allegations as true, it need not accept as true any "legal conclusions merely because they are cast in the form of factual allegations." W. Mining Council, 643 F.2d at 624.
 
 
 [6]
 Warren also argues that because he created nearly 2,000 musical works for MTM, the works were not specially ordered or commissioned. However, the number of works at issue has no bearing on the existence of a work-for-hire relationship. As the district court noted, a weekly television show would naturally require "substantial quantities of verbal, visual and musical content." 171 F.Supp.2d at 1069
 
 
 [7]
 Warren also claims the agreements are unenforceable for several other reasons, including fraud, misrepresentation, failure of consideration, and unconscionability. However, the district court, pursuant to 28 U.S.C. § 1367(c)(3), declined to exercise supplemental jurisdiction over these contract claims. 171 F.Supp.2d at 1074-75. Because we now uphold the district court's determination that the compositions are works for hire and Warren lacks standing to pursue his copyright claims, the only remaining claims are contractual in nature, and the district court's dismissal of these claims in favor of state court adjudication was not an abuse of discretionSee Skysign Int'l, Inc. v. City and County of Honolulu, 276 F.3d 1109, 1118 (9th Cir. 2002).