# United States Court of Appeals
## For the First Circuit

No. 19-1927

MARKHAM CONCEPTS, INC.; LORRAINE MARKHAM, individually and in
her capacity as trustee of the Bill and Lorraine Markham
Exemption Trust and the Lorraine Markham Family Trust;
SUSAN GARRETSON,

Plaintiffs, Appellants,

v.

HASBRO, INC.; BEATRICE PARDO, in her capacity as successor co-
trustee of the Reuben B. Klamer Living Trust; PAUL GLASS, in his
capacity as successor co-trustee of the Reuben B. Klamer Living
Trust; DAWN LINKLETTER GRIFFIN; SHARON LINKLETTER; MICHAEL
LINKLETTER; LAURA LINKLETTER RICH; DENNIS LINKLETTER; THOMAS
FEIMAN, in his capacity as co-trustee of the Irvin S. and Ida
Mae Atkins Family Trust; ROBERT MILLER, in his capacity as co-
trustee of the Irvin S. and Ida Mae Atkins Family Trust; MAX
CANDIOTTY, in his capacity as co-trustee of the Irvin S. and Ida
Mae Atkins Family Trust,

Defendants, Appellees,

IDA MAE ATKINS,

Defendant.

No. 21-1957

MARKHAM CONCEPTS, INC.; LORRAINE MARKHAM, individually and in
her capacity as trustee of the Bill and Lorraine Markham
Exemption Trust and the Lorraine Markham Family Trust;
SUSAN GARRETSON,

Plaintiffs, Appellees

v.

HASBRO, INC.,

Defendant, Appellant.

BEATRICE PARDO, in her capacity as successor co-trustee of the
Reuben B. Klamer Living Trust; PAUL GLASS, in his capacity as
successor co-trustee of the Reuben B. Klamer Living Trust; DAWN
LINKLETTER GRIFFIN; SHARON LINKLETTER; MICHAEL LINKLETTER; LAURA
LINKLETTER RICH; DENNIS LINKLETTER; THOMAS FEIMAN, in his
capacity as co-trustee of the Irvin S. and Ida Mae Atkins Family
Trust; ROBERT MILLER, in his capacity as co-trustee of the Irvin
S. and Ida Mae Atkins Family Trust; MAX CANDIOTTY, in his
capacity as co-trustee of the Irvin S. and Ida Mae Atkins Family
Trust; IDA MAE ATKINS,

Defendants.

No. 21-1958

MARKHAM CONCEPTS, INC.; LORRAINE MARKHAM, individually and in
her capacity as trustee of the Bill and Lorraine Markham
Exemption Trust and the Lorraine Markham Family Trust;
SUSAN GARRETSON,

Plaintiffs, Appellees

v.

BEATRICE PARDO, in her capacity as successor co-trustee of the
Reuben B. Klamer Living Trust; PAUL GLASS, in his capacity as
successor co-trustee of the Reuben B. Klamer Living Trust,

Defendants, Appellants

HASBRO, INC., DAWN LINKLETTER GRIFFIN; SHARON LINKLETTER;
MICHAEL LINKLETTER; LAURA LINKLETTER RICH; DENNIS LINKLETTER;
THOMAS FEIMAN, in his capacity as co-trustee of the Irvin S. and
Ida Mae Atkins Family Trust; ROBERT MILLER, in his capacity as
co-trustee of the Irvin S. and Ida Mae Atkins Family Trust; MAX
CANDIOTTY, in his capacity as co-trustee of the Irvin S. and Ida
Mae Atkins Family Trust; IDA MAE ATKINS,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Kayatta, Lipez, and Thompson, Circuit Judges.

Patricia L. Glaser, with whom Erica J. Van Loon, Joshua J. Pollack, Nixon Peabody LLP, Thomas P. Burke Jr., and Glaser Weil Fink Howard Avchen & Shapiro LLP were on brief, for defendants-appellants Beatrice Pardo and Paul Glass.

Joshua C. Krumholz, with whom Courtney L. Batliner, Mark T. Goracke, Holland & Knight LLP, Patricia K. Rocha, and Adler Pollock & Sheehan PC were on brief, for defendant-appellant Hasbro, Inc.

David A. Cole, with whom John T. Moehringer and Cadwalader, Wickersham & Taft LLP were on brief, for plaintiffs-appellees.

June 22, 2023

**LIPEZ**, **Circuit Judge**.    In this copyright action involving ownership rights to the classic board game, The Game of Life, conveyed more than six decades ago, the prevailing defendants seek attorney's fees from the unsuccessful plaintiffs.    The district court denied fees for the trial-level proceedings, and the defendants claim on appeal that the court abused its discretion in doing so.    The defendants also moved in this court for appellate attorney's fees.    The Copyright Act of 1976 permits the award of reasonable fees and costs to a prevailing party, see 17 U.S.C. § 505, and the Supreme Court has endorsed a set of nonexclusive factors to be considered by courts in evaluating whether to award fees, see Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 & n.19 (1994).    After carefully considering those factors and other aspects of the record, we affirm the district court's decision to deny fees and, primarily for the same reasons, decline to award fees for the appeal.

## I.

As detailed in our opinion on the merits, this case arose from a long-running dispute between Reuben Klamer, a toy developer who originated the idea for The Game of Life, and Bill Markham, a game designer whom Klamer asked to design and build the game prototype.    See Markham Concepts, Inc. v. Hasbro, Inc., 1 F.4th 74, 77-78 (1st Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022). The game was a huge success, and for decades following its debut

in 1960, Markham and Klamer clashed over who should receive primary credit for its creation. In general, Markham "felt that he was not given proper public recognition for his role" and that the royalty he received was "unfairly low." Id. at 78-79.

Markham died in 1993. This case was brought by his successors-in-interest against Klamer, who has since died,[1] and others (including Hasbro, Inc., the company that now holds rights to The Game of Life) in an attempt, inter alia, to renegotiate the original assignment of rights in the game.[2] As the district court observed, the plaintiffs' copyright claim "boiled down to two dispositive questions: did Bill Markham create the [p]rototype (such that he could fairly be considered its author); and was the [p]rototype a work made for hire?" Markham Concepts, Inc. v. Hasbro, Inc., No. 15-419 WES, 2021 WL 5161772, at *1 (D.R.I. Nov.

---

[1] Klamer died in September 2021, after we issued our merits decision but before the district court ruled on the fee requests. In Klamer's place, this action has been pursued by the co-trustees of the Reuben B. Klamer Living Trust. For convenience, we refer to Klamer when discussing arguments made in his briefs and motions. The Markham parties are Markham's widow, daughter, and Markham Concepts, Inc.

[2] The litigation originally was brought by the Markham parties primarily as a contract action against Hasbro seeking reinstatement of their royalty payments, which had stopped because of an issue with an escrow arrangement. They subsequently amended their complaint to add additional causes of action against Klamer and other defendants, including the copyright claim adjudicated by the district court and addressed in our merits decision. See Markham Concepts, 1 F.4th at 77. The escrow issue was resolved, and the parties stipulated to dismissal of the non-copyright claims.

5, 2021).

Answering those questions required application of the Copyright Acts of 1909 and 1976. Under the Copyright Act of 1976 ("1976 Copyright Act"), authors may have "the power to terminate the grant of a copyright after a certain period of time, see 17 U.S.C. §§ 203, 304(c), 304(d), thereby permitting them to extricate themselves from 'ill-advised' grants made before the 'true value' of their work was apparent." Markham Concepts, 1 F.4th at 79 (quoting Mills Music, Inc. v. Snyder, 469 U.S. 153, 172-73 (1985) (footnote omitted)). However, such "termination rights" do not extend to "work[s] made for hire." 17 U.S.C. § 304(c). Whether The Game of Life was "made for hire" is governed by the Copyright Act of 1909 ("1909 Act"), 17 U.S.C. § 26 (repealed 1978). See Markham Concepts, 1 F.4th at 81.

Following a bench trial that included testimony from Klamer and two employees of Markham's business who had worked on The Game of Life, the district court concluded that the prototype was indeed a work for hire created for Klamer. See Markham Concepts, Inc. v. Hasbro, Inc., 355 F. Supp. 3d 119, 130 (D.R.I. 2019). That decision meant that Markham was not the prototype's author for copyright purposes, foreclosing his successors-in-interest from terminating an assignment agreement that had been in effect, with minor adjustments, since 1959. Id.; see also Markham

- 6 -

Concepts, 1 F.4th at 79.[3]

In reaching its decision, the district court relied -- over the plaintiffs' objection -- on the "instance and expense" test that had long been used to evaluate whether a commissioned work subject to the 1909 Act was made for hire. See Markham Concepts, 355 F. Supp. 3d at 127-30.[4] The district court did not

---

[3] Markham's assignment agreement ("the 1959 Assignment Agreement") was with Link Research Corporation, co-founded by Klamer and Art Linkletter (a well-known radio and television personality). The agreement, inter alia, required Markham to assign to Link any copyright, patent, or trademark rights "to which he may be entitled as the inventor, designer and developer of the [g]ame." Markham Concepts, 1 F.4th at 85. Link separately entered into a license agreement with the Milton Bradley Company, giving Milton Bradley exclusive rights to make and sell The Game of Life in exchange for a six percent royalty on sales. Id. at 78. Hasbro subsequently acquired Milton Bradley, along with the rights to the game. Under Markham's initial agreement with Link, he received thirty percent of Link's six percent royalty (i.e., 1.8 percent of total royalties). Id. Although Markham's royalty on non-U.S. sales has varied over time, see infra, the domestic percentage has remained the same.

[4] The 1909 Act codified the longstanding principle that "a work created by an employee belongs to the employer, who is then viewed as the author and copyright holder." Markham Concepts, 1 F.4th at 79-80. Courts initially limited this "work for hire" concept to "'the traditional employer-employee relationship,' that is, to 'a work created by an employee acting within the scope of employment.'" Id. at 80 (quoting Forward v. Thorogood, 985 F.2d 604, 606 (1st Cir. 1993)). However, the work-for-hire concept was later expanded via the instance and expense test to include works created by independent contractors when the hiring party provided both the impetus (the "instance") and funding (the "expense") for the work. See id.; see also, e.g., Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 139 (2d Cir. 2013) (explaining that "instance" "refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work"). The 1976 Copyright Act contains an explicit, two-part definition for works for hire that applies to

- 7 -

address the defendants' alternative theory that the prototype qualified as a work for hire because it was created for Markham by his employees within a traditional employer-employee relationship -- which also would foreclose termination rights for the Markham parties. On appeal, we endorsed both the district court's approach and its outcome. We decided that courts within the First Circuit remain bound by our instance and expense precedent, see Markham Concepts, 1 F.4th at 81-83, and held that "the evidence amply support[ed] the district court's conclusion that the game was created at the instance and expense of Klamer" and was thus a work for hire, id. at 86.[5]

Months after we issued our decision on the merits, the district court denied the defendants' pending motions for attorney's fees and costs for the trial-level proceedings. See

---

works created on or after January 1, 1978. See 17 U.S.C. § 101; see also Markham Concepts, 1 F.4th at 80.

[5] As described in our opinion on the merits, some cases suggest that the parties in a work-for-hire relationship can agree that authorship rights will belong to the work's actual creator rather than to the person at whose instance and expense the work is made. See Markham Concepts, 1 F.4th at 85 & n.7. However, work-for-hire status is presumed when the elements of the instance and expense test are met, and "courts generally demand clear and specific evidence" to rebut that presumption. Id. Both the district court and our court held that the assignment agreement between Markham and Link did not overcome the work-for-hire presumption. See id. at 85-86.

Markham Concepts, 2021 WL 5161772, at *5.[6] Hasbro and Klamer filed separate appeals of that ruling,[7] and each also filed a motion for an award of attorney's fees on appeal.[8] We subsequently consolidated the district court fee appeals with the motions for appellate fees.

## II.

### A. Legal Principles

Section 505 of the 1976 Copyright Act allows a court, in its discretion, to award reasonable attorney's fees to a prevailing party. See 17 U.S.C. § 505.[9] The statute "requir[es] an 'evenhanded' approach under which '[p]revailing plaintiffs and prevailing defendants are to be treated alike.'" Airframe Sys.,

---

[6] Hasbro requested fees in the amount of $1,951,323.63 and $10,256.45 in costs, plus $9,112.36 for travel. Klamer requested fees in the amount of $1,827,393.50 plus costs of $38,953.81.

[7] Multiple defendants associated with Art Linkletter also were defendants in the copyright action and requested $583,709.50 in attorney's fees in the district court. They did not appeal the denial of those fees and have not requested appellate fees.

[8] Hasbro seeks $271,674.20 in attorney's fees on appeal, and Klamer seeks $238,086.34 in appellate attorney's fees.

[9] Although the 1909 Act applies to the substantive issues in this case, the defendants sought fees under § 505 of the 1976 Copyright Act rather than under the comparable provision of the 1909 Act, § 116. In its motion for appellate fees, Hasbro notes that it is unclear which fees provision applies to this case. However, the plaintiffs have not disputed the applicability of § 505, and the two provisions are in any event similar. See Fogerty, 510 U.S. at 523-24. We therefore presume that § 505 applies.

Inc. v. L-3 Commc'ns Corp., 658 F.3d 100, 108 (1st Cir. 2011) (quoting Fogerty, 510 U.S. at 521, 534) (second alteration in original).  Although "[t]here is no precise rule or formula for" determining whether to award attorney's fees under § 505, Fogerty, 510 U.S. at 534 (quoting Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)), the Supreme Court has endorsed "several nonexclusive factors to guide" a court's decision: "'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence,'" id. at 534 n.19 (quoting Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)).  Courts considering fee requests "should give substantial weight to the objective reasonableness of the losing party's position," but "must also give due consideration to all other circumstances relevant to granting fees."  Kirtsaeng v. John Wiley & Sons, Inc., 579 U.S. 197, 199, 200 (2016).

The relevant "other circumstances" include the purpose of copyright law and its objective of "enriching the general public through access to creative works."  Id. at 204 (quoting Fogerty, 510 U.S. at 527).  The 1976 Copyright Act endeavors to achieve that goal "by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling

others to build on that work." Id.[10]  Though guided by the Supreme

Court's criteria and the objectives of copyright law, courts

ultimately have "broad discretion . . . in deciding whether to

fee-shift."  Id. at 208; see also id. at 209 ("[C]ourts must view

all the circumstances of a case on their own terms, in light of

the Copyright Act's essential goals.").

With these principles in mind, we first consider the

district court's fees determination and then address Klamer's and

Hasbro's motions for appellate fees.

**B. Appeals from the Denial of Fees**

**1.  The District Court's Decision**

In its ruling on the defendants' fee requests, which it

---

[10] As Klamer points out, some circuits take the view that fee awards under § 505 should be "the rule rather than the exception and should be awarded routinely."  Bell v. Eagle Mountain Saginaw Indep. Sch. Dist., 27 F.4th 313, 326 (5th Cir. 2022) (quoting Virgin Records Am., Inc. v. Thompson, 512 F.3d 724, 726 (5th Cir. 2008)).  The Seventh Circuit treats that "rule" as a presumption that the prevailing party is entitled to a fee award and, "[i]n the case of prevailing defendants, . . . this presumption [is] 'very strong.'"  Mostly Memories, Inc. v. For Your Ease Only, Inc., 526 F.3d 1093, 1099 (7th Cir. 2008) (quoting Assessment Techs. of WI, LLC v. WIREdata, Inc., 361 F.3d 434, 437 (7th Cir. 2004)). However, other circuits have disagreed that the inquiry should tilt in favor of a fee award.  See, e.g., Designworks Homes, Inc. v. Thomson Sailors Homes, L.L.C., 9 F.4th 961, 965 (8th Cir. 2021), cert. denied sub nom James v. Thomson Sailors Homes, L.L.C., 143 S. Ct. 147 (2022); Marshall & Swift/Boeckh, LLC v. Dewberry & Davis LLC, 586 F. App'x 448, 449 (9th Cir. 2014); Lava Records, LLC v. Amurao, 354 F. App'x 461, 462-63 (2d Cir. 2009).  We see no reason to depart from our approach of applying the factors without a predisposition toward granting fees.  See, e.g., Airframe Sys., 658 F.3d at 108-110.

- 11 -

characterized as "a close call," the district court focused primarily on the reasonableness of the Markham parties' copyright claim. Markham Concepts, 2021 WL 5161772, at *1. After briefly describing the competing contentions, the court concluded that "both sides raised plausible arguments and [p]laintiffs' claim, though unsuccessful, was not so weak as to be objectively unreasonable to pursue." Id. at *4.

With respect to the governing law, the court noted that the plaintiffs had expert support in arguing that the Supreme Court, in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), had abrogated the instance and expense test for identifying works for hire under the 1909 Act. See Markham Concepts, 2021 WL 5161772, at *2 (citing Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 9.03[D] (2019)). Primarily for that reason, the court "hesitate[d] to say that [p]laintiffs 'argue[d] for an unreasonable extension of copyright protection.'" Id. (quoting Matthews v. Freedman, 157 F.3d 25, 29 (1st Cir. 1998) (third alteration and emphasis in district court opinion)).[11] The court similarly concluded that the plaintiffs' factual arguments were not unreasonable. See id. at *3-4. The court observed that

_____

[11] The district court also considered it "somewhat telling" that the status of the instance and expense test after Reid had been raised by other litigants before the Supreme Court, "lend[ing] some support to the conclusion that [p]laintiffs' position was reasonable." Markham Concepts, 2021 WL 5161772, at *2 n.7 (citing Markham Concepts, 1 F.4th at 83 n.4).

- 12 -

"[b]oth sides came to trial with evidence to support their claims on all theories," id. at *3, and it stated that "[d]efendants' success turned on how the factfinder interpreted the evidence and assessed credibility," id. at *4.

After finding that the plaintiffs' case was not "objectively unreasonable," the court "ma[de] quick work" of the other Fogerty factors. Id. It observed that, "[b]ecause the case was not objectively unreasonable, it follows that it was not frivolous." Id. The court also detected "[n]othing in the record" to show "that [p]laintiffs proceeded with an improper motivation that justifies an award," and it did not see "any meaningful deterrence effect" from awarding fees to the defendants. Id. Based on its assessment of the factors, "the [c]ourt conclude[d] that the litigation furthered the purposes of the Copyright Act," leading it to deny the defendants' fee requests. Id. at *5.

## 2. Discussion

On appeal, the defendants insist that the district court misjudged the strength of both the legal and factual arguments advanced by the plaintiffs. Hasbro and Klamer assert that the court did not adequately address the serious flaws in the Markham parties' contentions, disregarding what they characterize as the "fundamental problems with [p]laintiffs' legal positions" and failing to properly weigh the evidence in the record showing that the prototype was a work made for hire. The court further erred,

the defendants claim, by summarily discounting the significance of other factors -- particularly the plaintiffs' improper motivations and the need for compensation and deterrence.

As we have noted, a district court's ruling on fees may be reversed only for an abuse of discretion. See Small Just. LLC v. Xcentric Ventures LLC, 873 F.3d 313, 326 (1st Cir. 2017). Indeed, we have observed that such rulings are entitled to "extreme[]" deference, T-Peg, Inc. v. Vt. Timber Works, Inc., 669 F.3d 59, 61 (1st Cir. 2012) (quoting Airframe Sys., 658 F.3d at 109), because "the trial court is in the best position to gauge the bona fides of a request for fees," Spooner v. EEN, Inc., 644 F.3d 62, 70 (1st Cir. 2011).

With that wide berth for the district court's judgment call on fees, we see no basis for overriding the court's discretionary decision against fee-shifting in this case. The law applicable to the Markham parties' copyright claim was not so black-and-white that the district court acted unjustifiably when it deemed their argument against the instance and expense test as within the realm of reasonableness. As we observed in our merits opinion, the view that the Supreme Court's decision in Reid had effectively abrogated the instance and expense test "has at least one influential adherent" (i.e., the Nimmer copyright law treatise). Markham Concepts, 1 F.4th at 83 & n.3. In addition, our court's post-Reid decision invoking that test, Forward v.

- 14 -

Thorogood, 985 F.2d 604 (1st Cir. 1993), did not expressly consider the test's continuing viability after Reid. See Markham Concepts, 1 F.4th at 81-82. With those two factors on their side, the plaintiffs' attempt to piggyback on the analysis in Reid and diminish the precedential force of Forward was not as unreasonable as the defendants depict it to be. The plaintiffs did not ask the district court to ignore our precedent. Rather, they argued that their interpretation of Reid should be considered because it had not been raised by the parties in Forward.

A similar assessment applies to the facts. There was enough ambiguity in the evidence that was before the district court on how The Game of Life prototype was created, as well as on the understanding between Markham and Klamer about who should be designated the prototype's author, that we cannot reject the court's view that the plaintiffs' factual position was not wholly unreasonable. Although the district court acknowledged that factual reasonableness was "a closer call" than legal reasonableness, it noted that the record contained "contemporaneous documents" -- including the 1959 Assignment Agreement and letters between Markham and Klamer -- indicating that the two men viewed Markham as the prototype's "creator" such that he was the copyright holder. See Markham Concepts, 2021 WL

5161772, at *3.[12]

Moreover, while testimony from Markham's employees about their contributions to the prototype unquestionably weakened the plaintiffs' claims, it was up to the district court -- as it observed -- to "interpret[] the evidence and assess[] credibility." Id. at *4; see also Markham Concepts, 1 F.4th at 84 n.6 (noting that "it was the district court's job to sort through the evidence and decide what and who was credible"). The testimony of the employees, Grace Falco Chambers and Leonard Israel, was elicited in November 2017 about events that had transpired more than a half-century earlier. It was thus not inevitable that the district court would fully credit the testimony adverse to the Markham parties' position and construe the contemporaneous written evidence and prior statements against their view that Markham

---

[12] The 1959 Assignment Agreement between Markham and Link included a provision stating that, "[a]t the request of LINK, MARKHAM has invented, designed and developed a game tentatively known as 'THE GAME OF LIFE.'" Further, the agreement required Markham, upon Link's request, to pursue any intellectual property rights "to which he may be entitled as the inventor, designer and developer of the [g]ame" and to assign any such rights to Link, "provided that said assignments will revert to MARKHAM upon the termination of this agreement." Markham Concepts, 1 F.4th at 85. Klamer also praised Markham's work in a September 1965 letter, stating that "You did a good job. I think that the product you . . . came up with was topnotch." In that same letter, Klamer reported to Markham that he had asked Milton Bradley to credit Markham on the game packaging, but the toy company had declined to do so. In another early example of the evidence of Markham's role, a 1960 letter to a Link vice president from Milton Bradley's vice president referred to "the LIFE game of Bill Markham."

- 16 -

should be credited with creating the prototype. Although the evidence strongly indicated that any such authorship by Markham was at Klamer's instance and expense, we noted in our merits decision that it was "a closer question" whether the assignment agreement between Klamer and Markham rebutted the work-for-hire presumption created by the instance and expense test. Markham Concepts, 1 F.4th at 85.

Contrary to Klamer's argument, the district court's observation that the case "turned on how the factfinder interpreted the evidence and assessed credibility," Markham Concepts, 2021 WL 5161772, at *4, does not reflect legal error or an assumption that attorney's fees should "not be awarded unless a party succeeds on summary judgment." Rather, in context, the district court's statement simply reflects its view that a thorough weighing of the strengths of both sides' evidence in this case led to its conclusion that the plaintiffs' claim was not "objectively unreasonable to pursue." Id.

Hasbro and Klamer argue that, even if the instance and expense test did not apply, the plaintiffs' case was still factually hopeless because the evidence unequivocally supported their alternative theory for classifying the prototype as a work for hire -- i.e., that it was created within a traditional employer-employee relationship by Chambers and Israel for Markham. Both defendants emphasize that the Markham parties' counsel

- 17 -

acknowledged in a colloquy with the district court that, if the court found that Israel and Chambers were Markham's employees, there would be no termination rights. The attorney made this comment while attempting to persuade the court, post-judgment, to reconsider its use of the instance and expense test and adjust its findings to declare that Markham was the author of the prototype.

However, as we have noted, the district court did not address the alternative work-for-hire theory in its decision on the merits. Although the court briefly referred to the theory in its fees decision -- recognizing the force of the defendants' position in light of Chambers' and Israel's testimony -- it declined to entirely discredit the plaintiffs' view of the facts. See Markham Concepts, 2021 WL 5161772, at *3-4 (stating, inter alia, that "[b]oth sides came to trial with evidence to support their claims on all theories" (emphasis added)). We, in turn, decline to override the district court's overall assessment of the plaintiffs' factual case, particularly in the absence of findings and a ruling on the alternative theory.

To be sure, the evidence shows substantial individual contributions by Israel and Chambers to the game box and board. The record is less clear, however, on how the various components of The Game of Life came together into the protectible creation defined by the 1976 Copyright Act as an "original work[] of authorship fixed in a[] tangible medium of expression." 17 U.S.C.

- 18 -

§ 102(a). For example, the record contains Markham's deposition testimony in 1989 that, before Klamer approached him about The Game of Life, he had invented a three-dimensional, foldable game-board format, which was the style ultimately used for the prototype.[13] In the same deposition, Markham described affixing the "track" to the game board for the first time when he brought the elements of the prototype to a meeting with Milton Bradley representatives at a Los Angeles restaurant in August 1959.[14]

---

[13] Markham's 1989 testimony was elicited in a California state-court action he brought against Milton Bradley and the Link partners in a dispute over foreign royalties. The case settled, with Markham receiving an increased royalty percentage on overseas sales.

[14] The record also includes Chambers' testimony that some parts of the "final" prototype game board -- including the spinner, mountains, and "circuitous track" -- were constructed in plastic by outside contractors based on the models created in-house in paper, cardboard, or wood. She did not say whether she attached the plastic versions of those items to the board. Israel's testimony about how the prototype was constructed also left room for interpretation. At one point, he testified that he had primary responsibility for the box cover, Sue Markham had primary responsibility for the rules, and Chambers "[a]ssembled the things in the proper place and with the proper kind of wording and colors . . . on the final board." Following up on re-cross, the plaintiffs' attorney noted that Israel had described "the process where you took the thumbnail sketches and then put it on the final board," and "[e]ach time you've said we put it on the board." The attorney then asked: "Who are you referring to when you say we?" Israel answered:

> I guess I always thought of the team who was working on The Game of Life, and I just referred to the group as we because I did some of it, Grace did some of it, Bill did some of it, Reuben did his part. So everybody was working on this at different times and you

- 19 -

Given its holding that the prototype was a work for hire created for Klamer, the court did not need to delve into the details relevant to the alternative theory that it was a work for hire created for Markham by Chambers and Israel.[15]  Indeed, the district court's choice not to reinforce its work-for-hire conclusion based on this alternative theory may indicate that it viewed the record evidence as more complex than the defendants acknowledge.[16]  Although Hasbro blames the plaintiffs for any such

_____

> never just isolated it and had no input from everyone else.

[15] Hasbro intimates that Markham's claim to authorship could have succeeded only if he "alone, physically created every copyrightable aspect of the Prototype," but it provides no citation for that principle of law.  (Emphasis omitted.)  We decline to delve sua sponte into the intricacies of copyright law with respect to a work that may have been created in part by employees of an employer who also himself created elements of the work.  No party in this case has suggested formal joint authorship by Markham, Chambers, and Israel, and we note the issue only because Hasbro's assertion appears to disregard the concept of a joint work that is explicitly recognized by the 1976 Copyright Act.  See generally Reid, 490 U.S. at 753 (observing that the organization that hired an independent contractor to sculpt a statue may be a joint author with the artist if the artist and the organization, which provided some elements of the finished piece, "prepared the work 'with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.'" (quoting 17 U.S.C. § 101)).

[16] The district court suggested as much during the hearing on the Plaintiffs' Motion to Amend Findings of Fact and Conclusions of Law.  The court wondered whether it should "write up something" to explain its view of the parties' post-judgment arguments.  The court recognized, however, that it would then need to deal with a host of other arguments -- "all those things that I didn't deal with because I didn't have to."

- 20 -

lack of clarity, the record is not so straightforward that we can say the district court erred in finding that the Markham parties "did not purposefully obscure relevant evidence" or "make false assertions." Markham Concepts, 2021 WL 5161772, at *3. In any event, we are unwilling to reject the district court's evaluation of the plaintiffs' factual arguments based on a theory that was only lurking in the background.

Nor do we see any critical flaw in the court's brief treatment of the motivation and deterrence factors. Giving authors the opportunity to negotiate a better deal is the rationale for the termination provision in the 1976 Copyright Act, and the district court appeared to construe the litigation to have such a purpose. See id. at *1 (noting that plaintiffs would use a ruling in their favor "to renegotiate a royalty agreement they found lacking").

The Markham parties, meanwhile, say their "primary motivation" was not in fact financial, but rather "to restore credit to Bill Markham as being the author of [T]he Game of Life." The plaintiffs insist that "[a]ny ability to renegotiate the applicable contracts would have focused on [the motivation to restore credit], not on increasing royalty rates." In addition, the Markham parties say, they sought "to separate themselves from Klamer, who had long attempted to control all royalties associated with the [g]ame." These nonmonetary purposes for the litigation

also are proper.  See Spooner, 644 F.3d at 69 ("Copyright cases are a prime example of a situation in which obtaining non-monetary relief or establishing a principle may be worth considerably more than the damages recovered.").[17]

As for deterrence, Klamer accuses the district court of ignoring that Markham and his successors-in-interest "have fought with Klamer over royalties and authorship of the [g]ame for nearly sixty years," and he asserts that "[t]here was no basis for the court to conclude that [p]laintiffs will stop without the deterrent of an attorneys' fee award."  (Emphasis omitted.)  To the contrary, we think it apparent why the district court found no need to deter these plaintiffs from further copyright litigation.  Having failed to prove that Bill Markham should be credited as the author of the prototype and was therefore entitled to termination rights, the plaintiffs now have no choice but to live with the agreement that Markham reached with Link in 1959 (as slightly modified in the

---

[17]  We are by no means suggesting that the Markham parties lacked any financial motivation.  After Chambers and Israel testified, Hasbro offered to forego a claim for attorney's fees and costs in exchange for the plaintiffs' agreement to dismiss all claims against the company.  The Markham parties rejected that proposal with a counteroffer that included Hasbro's payment of "a substantial lump sum that properly recognizes Mr. Markham's long-overlooked contributions to the [g]ame to be paid out as the parties may negotiate."  The other two elements of the counteroffer were non-financial: "assurances that Hasbro will acknowledge Bill Markham as the sole designer and creator of the [g]ame henceforth" and "a separate escrow agreement with the Markham [p]arties for the payment of all future royalties related to the [g]ame."

1980s).[18]  No court would look favorably on new litigation challenging that arrangement, and the outcome of this case on the merits thus provides adequate deterrence against plaintiffs pursuing any such action.

In addition, despite the high costs of this litigation, see supra notes 6-7, the district court at no point suggested that it believed plaintiffs had "litigat[ed] in a manner greatly disproportional to the matter at stake" such that the case warranted a fee award to deter other plaintiffs from adopting similar "trial strategies."  T-Peg, Inc., 669 F.3d at 62; see also Kirtsaeng, 579 U.S. at 209 (noting that "a court may order fee-shifting . . . to deter . . . overaggressive assertions of copyright claims, . . . even if the losing position was reasonable in a particular case").  We cannot say the court erred by failing to conclude that similarly ambitious copyright claims should be deterred by fee-shifting in this case.  See T-Peg, 669 F.3d at 62 n.4 (observing that "the district court was in the best position to assess the reasonableness of [the plaintiff's] litigation tactics"); Markham Concepts, 2021 WL 5161772, at *4 (stating that the court was unconvinced that "an award [would] serve any meaningful deterrence effect").

---

[18] The finality of their copyright claim became indisputable with the denial of their request for Supreme Court review of our decision on the merits.  See Markham Concepts, Inc. v. Hasbro, Inc., 142 S. Ct. 1414 (2022).

Also, like the district court, we find unpersuasive Klamer's argument that he is entitled to greater consideration for fees, as an equitable matter of compensation, because he "proceeded through the litigation as a single individual, and one in frail health." Markham Concepts, 2021 WL 5161772, at *4 n.11. Without elaboration, the district court noted that "[o]n balance," Klamer's circumstances "do[] not weigh heavily enough in favor of an award." Id. The substantial overlap between Klamer's arguments and those of the other defendants -- particularly Hasbro -- suggests that Klamer could have relied primarily on the toy company and its resources to defend against the Markham parties' claims. Hence, the district court reasonably could have questioned the need for so much redundancy, at great cost. Whether that reason or some other concern influenced the court, we fail to see error in its conclusion that, as a matter of equity, the compensation factor did not weigh in favor of shifting Klamer's legal fees to the Markham parties.

Nor do we find reason to second-guess the district court's denial of fees to Hasbro on the ground -- urged by Hasbro at oral argument -- that the court did not expressly consider the need for compensating the company. Given the court's assessment of the other factors, we think it apparent that the court found no reason to compensate Hasbro for its defense of the case. See generally Airframe Sys., 658 F.3d at 108 (noting that "litigants

customarily bear responsibility for their own legal fees").

In sum, we find no abuse of discretion in the district court's discretionary judgment against shifting the defendants' trial-level legal fees to the plaintiffs.[19]

## C. The Motions for Appellate Fees

Our analysis in concluding that the district court did not abuse its discretion in rejecting Hasbro's and Klamer's trial-level fee requests also provides some support for the Markham parties' contention that we should likewise deny the requests for appellate legal fees. Most of the factors discussed above play out similarly with respect to the appeal, most notably the reasonableness of plaintiffs' argument that Reid discredited the instance and expense test for identifying a work for hire under the 1909 Copyright Act. Indeed, that legal argument was more reasonably made to our court than to the district court, which would have been on shakier ground to disregard Forward's use of the instance and expense test post-Reid.

We cannot characterize as objectively unreasonable the Markham parties' attempt to persuade our panel that we should not feel bound by Forward because, in Forward, Reid's impact on the instance and expense test was not raised by the parties or

_____

[19] We note that the district court awarded the defendants their costs pursuant to Federal Rule of Civil Procedure 54(d)(1), amounting to $10,256.45 for Hasbro and $38,953.81 for Klamer.

considered by the panel.  Given the lack of attention to the issue in Forward, we think it was not beyond reason for the Markham parties to have argued that the case was vulnerable precedent.  In addition, our analysis did not treat their Reid argument dismissively.  To the contrary, we expressed our disagreement in qualified terms, noting that "we are skeptical that the Supreme Court . . . casually and implicitly did away with a well-established test under a different Act."  Markham Concepts, 1 F.4th at 83 (emphasis added).[20]

On the other hand, the Markham parties face a higher hurdle with respect to the factual reasonableness of their appeal challenging the district court's finding that The Game of Life prototype was a work for hire for Klamer.  As noted in our merits opinion, their two arguments against finding the prototype to be a work for hire under the instance and expense test "rais[ed] fact-intensive mixed questions, which we review with some deference to

---

[20] Notably, in justifying the substantial amount of attorney's fees it sought for the proceedings in district court, Hasbro asserted that the Markham parties' "claim implicated areas of copyright law with limited precedent, and raised esoteric questions regarding the 1909 Act and its relationship to termination rights and the work-for-hire doctrine."  Defendant Hasbro, Inc.'s Motion for Attorney's Fees and Costs at 26, Markham Concepts, Inc. v. Hasbro, Inc., No. 1:15-cv-00419-WES-PAS (D.R.I. Nov. 5, 2019).  Consistent with that depiction of the claim, neither the district court nor our court -- as we have described -- approached the questions it triggered as obvious or inconsequential.

the district court." Id.[21] The standard of review thus posed a barrier to a different outcome on appeal. Nonetheless, we are unpersuaded that the plaintiffs' appellate contentions were beyond the bounds of reasonableness. As noted above, we recognized as a "closer question" whether the record sufficiently rebutted the work-for-hire presumption that arises from the instance and expense test. Id. at 85. That presumption question required us to construe the 1959 Assignment Agreement, a task that was properly performed by us de novo because it did not require consideration of witness demeanor or credibility. Importantly, in interpreting the written document, we did not reject the Markham parties' argument out-of-hand. Rather, we closely considered the contract language before agreeing with the district court that the language "is best read" adversely to the Markham parties' position and, hence, that "[t]he district court . . . supportably found that the assignment agreement did not overcome the presumption that the game was a work for hire made for Klamer." Id. at 85, 86. Our careful analysis belies any intimation that the argument was frivolous or objectively unreasonable.

We also reject the defendants' assertions that we should deem the appeal objectively unreasonable based on the strength of

---

[21] The arguments to which we referred were the prototype's failure to satisfy the expense prong of the test and the assignment agreement's supposed rebuttal of the presumption created by the test. See Markham Concepts, 1 F.4th at 83-85.

their alternative work-for-hire theory.  Hasbro and Klamer insist that, even if the Markham parties did not unreasonably ask us to reverse the district court's finding that the prototype was a work for hire for Klamer, their appeal was unreasonably pursued because the facts unequivocally show that it was a work for hire by Markham's employees for him.  For the reasons discussed above, we do not view the evidence on the roles played by Markham, Chambers, and Israel to be so clearly decisive that we can conclude that the appeal was objectively unreasonable on that basis, particularly in the absence of pertinent factfinding by the district court.  If we had concluded that the prototype was <u>not</u> a work for hire for Klamer, the proper course would have been to remand the case to the district court for factfinding on the remaining theories and issues.

Moreover, the Markham parties' attorney told the district court that even a finding that the game was a work for hire for Markham, rather than Klamer, would be beneficial to the plaintiffs because -- though no termination rights would exist -- Markham's legacy would be preserved as "the author, the true creator of the [g]ame."  The plaintiffs continue to press that perspective in their opposition to the appellate fees motions, insisting that "a declaration that Bill Markham was the author of [T]he Game of Life," even in a work-for-hire context, "would have been a significant victory."  The potential impact of the

alternative work-for-hire theory on plaintiffs' case thus remains debatable and, for that reason as well, the theory does not provide a basis for deeming the plaintiffs' appeal factually unreasonable.[22]

Hence, the Fogerty unreasonableness factor that is due "substantial weight," Kirtsaeng, 579 U.S. at 210, does not favor imposing responsibility for the defendants' attorney's fees on the plaintiffs. As the district court observed, "unpersuasive arguments are not necessarily unreasonable ones." Markham Concepts, 2021 WL 5161772, at *4. Nor are there circumstances that lean sufficiently in the other direction to persuade us that fee-shifting is appropriate. As a general matter, this was a multi-layered case that ultimately served Hasbro's and Klamer's interests by permanently settling the authorship question and ending decades of dispute over Markham's role and possible copyright rights. Their robust advocacy no doubt reflects the value of that stability. With respect to the plaintiffs' motivation, we reiterate that renegotiating the royalty arrangement and establishing Markham as the prototype's author

---

[22] The plaintiffs also argued to the district court that "the theory of Markham being the employer" was introduced too late and should not have "been allowed in the case." In our merits decision, we noted the absence of any apparent prejudice from the district court's failure to strike that alternative theory because it had not been adopted by either the district court or us. See Markham Concepts, 1 F.4th at 86.

were permissible, plausible objectives. The record contains descriptions by Klamer of Markham's contributions that support the plaintiffs' stated objective to highlight and cement Markham's role in producing the prototype, which was the copyrightable "work[]." 17 U.S.C. § 102(a). Among these were Klamer's comment that Markham had "c[o]me up with" a "topnotch" product at Klamer's request and Klamer's description of Markham in a 1997 letter to Hasbro as his "co-inventor . . . who reduced my ideas to practice in the concrete form of a 3-[d]imensional prototype."

In our view, Klamer's and Hasbro's arguments on motivation -- depicting the copyright claim as improperly driven solely by greed or animosity toward Klamer -- are way off the mark. There is nothing sinister about a financial motive. As we have explained, the very purpose of the statutory termination right is to enable an author to renegotiate the terms -- financial and otherwise -- of an early assignment of rights. Klamer and Hasbro, however, appear to question the legitimacy of that objective for these plaintiffs. Klamer points to Markham's late-in-life marriage to his widow, and Hasbro notes that "Markham's widow and her daughter attempted to use [§ 304(c)] to create leverage to renegotiate an already lucrative deal -- one that paid them handsomely for having played no role in the creation of the [g]ame." In pressing the argument that the case as litigated was an unjustified "play for more money," Hasbro and Klamer point out

that the original trigger for the lawsuit -- the lapse in the royalty payments due to Markhams' successors-in-interest -- was quickly resolved by the district court. That resolution, however, does not negate the plausibility of the plaintiffs' stated desires to establish Bill Markham's legacy and obtain a method for receipt of royalty payments independent of Klamer.

Despite the Markham parties' lack of success in the litigation, we fail to see how the objectives of the 1976 Copyright Act would be advanced by compensating Hasbro at the plaintiffs' expense. To the contrary, a "co-inventor's" action to clarify and settle authorship and intellectual property rights -- so long as the claim is not objectively unreasonable on the facts or the law -- is in keeping with the Act's purpose to "encourag[e] and reward[] authors' creations." Kirtsaeng, 579 U.S. at 204. It may be true, as Hasbro emphasizes, that Markham and his heirs "have made millions of dollars" from the deal that Markham and Klamer negotiated in 1959, but Link's agreement with Milton Bradley for a six percent royalty left the game company with the bulk of the proceeds from The Game of Life. Moreover, somewhat at odds with Hasbro's insistence (echoed by Klamer) that Markham improved upon his "generous deal" multiple times, the record in fact indicates that Markham and Link received a reduced percentage of the game's

- 31 -

royalties on international sales starting in 1964.[23]

We likewise do not view the compensation factor to favor Klamer, having the same perspective toward attorney's fees on appeal that we noted with respect to his claim for reimbursement in the trial court. Given the substantial overlap in the arguments presented to us by Klamer and Hasbro, it would appear that Klamer had an opportunity to rely on Hasbro and its greater resources to finance the appeal and avoid duplicative expenses. Hence, we do not see the compensation factor weighing in favor of imposing Klamer's appellate litigation costs on the Markham parties.[24]

Finally, consistent with our discussion of the trial-

---

[23] At Milton Bradley's request, Markham and Link agreed in 1963 to reduce the royalties on overseas sales because the higher royalty requirement was presenting a barrier to such sales. Link's percentage was decreased from six percent to three percent. Markham's share of that reduced royalty relative to Link's was higher -- fifty percent rather than thirty percent -- but his percentage of the total royalties on non-domestic sales dropped from 1.8 percent to 1.5 percent. Subsequently, in the settlement of the California state-law litigation, Markham was given 36.66 percent of the then-current 4.5 percent royalty on international sales that Milton Bradley was paying to Link (roughly 1.65 percent of total royalties). We recognize, of course, that the reduced royalty percentage may have been offset by increased overseas sales.

[24] We note that Klamer was a principal in Link Research, the entity that contracted with Milton Bradley to license The Game of Life and that received the majority of the royalties that Milton Bradley paid under that contract -- seemingly placing Klamer in an advantageous position relative to Markham vis-a-vis the game's financial rewards. The record indicates that Klamer was entitled to fifty percent of Link's value when the company was dissolved in 1968.

level fees, we do not believe a fee award for the appellate-level proceedings would serve a deterrence objective, either with respect to the plaintiffs in this case or others. See, e.g., Shame on You Prods., Inc. v. Banks, No. CV 14-03512-MMM, 2016 WL 5929245, at *10 (C.D. Cal. Aug. 15, 2016) (noting that courts consider both "specific deterrence," focusing on the parties in the case, and "general deterrence," focusing on the potential effect on future litigants). The plaintiffs' losses at the trial, appellate, and Supreme Court levels should be adequate deterrence to further litigation concerning authorship of The Game of Life and the associated copyright rights. Nor do we think an award of fees to Hasbro and Klamer would advance the purpose of the Copyright Act by deterring others from filing ill-advised actions or litigating reasonable ones excessively. As our discussion indicates, we do not view this case in that light.

Hence, we follow the lead of the district court and leave to each party the burden of their own legal fees. Accordingly, we affirm the decision of the district court denying Hasbro's and Klamer's trial-level fee requests pursuant to 17 U.S.C. § 505 and deny their motions for appellate fees.

So ordered. Each party to bear its own costs.